FREEPORT MINERALS COMPANY, (FREEPORT–McMORAN, INC.), Appellant,

v.

The UNITED STATES, Appellee,

Shell Canada Resources Ltd. and Canadian Superior Oil, Ltd., Intervenors.

Appeal No. 84–1591.

United States Court of Appeals, Federal Circuit.

Nov. 7, 1985.

Harvey M. Applebaum, argued, Covington & Burling, Washington, D.C., for appellant. With him on brief was David R. Grace; Albert F. Rothwell, Vice President, Freeport Minerals Co., New York City, of counsel.

Sheila N. Ziff, argued, Dept. of Justice, Washington, D.C., for appellee United States. With her on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Velta A. Melnbrencis, Asst. Director.

Patrick F.J. Macrory, argued, Arnold & Porter, Washington, D.C., for intervenor Shell Canada. With him on brief was Spencer S. Griffith.

David J. Mark, argued, Shearman & Sterling, New York City, for intervenor Canadian Superior. With him on brief was Donald L. Cuneo.

Before BENNETT, Circuit Judge, JACK R. MILLER,[*] Senior Circuit Judge, and EDWARD S. SMITH, Circuit Judge.

JACK R. MILLER, Senior Circuit Judge.

This is an appeal by a domestic producer of elemental sulfur from the decision of the United States Court of International Trade granting the Government's motion for summary judgment and thereby affirming the International Trade Administration's final determination to revoke its antidumping finding regarding two Canadian producers. We reverse and remand for further proceedings.

## BACKGROUND

The relevant facts of this case are described extensively in the published opinion of the Court of International Trade ("CIT"), 590 F.Supp. 1246 (1984), and familiarity therewith is presumed. Only the facts critical to the disposition of this case are repeated.

In 1973, the Treasury Department ("Treasury")[1] issued a finding of dumping against a number of Canadian manufacturers of elemental sulfur, including Shell Canada Resources Limited ("Shell") and Canadian Superior Oil Limited ("Superior"), intervenors in this appeal. 38 Fed.Reg. 34,655 (1973). In February of 1979, Treasury issued a tentative determination to modify or revoke the finding, having found an absence of sales at less than fair value ("LTFV") between January, 1975, and December, 1976. 44 Fed.Reg. 8,057 (1979). However, no final action was taken by Treasury.

In January, 1980, the Department of Commerce International Trade Administration ("ITA") assumed administrative responsibility for the provisions of the Trade

---

[*] Judge Miller assumed senior status on June 6, 1985.

1. Predecessor administering authority for the federal antidumping statute, the Antidumping Act of 1921, as amended, 19 U.S.C. § 160 *et seq.*

(1970). This statute was replaced by the Trade Agreements Act of 1979, 19 U.S.C. §§ 1671–1677g, when it became effective January 1, 1980.

Agreements Act ("TAA") and began an administrative review required under section 751(a) of the act, 19 U.S.C. § 1675(a). *Elemental Sulphur From Canada*, 46 Fed.Reg. 45,789 (1981). The ITA requested and received data for the years 1977 and 1978 from Shell and Superior, both of which also agreed in writing to an immediate suspension of liquidation and reinstatement of the dumping finding should the evidence later indicate that elemental sulfur produced by them was imported into the United States at LTFV. In April, 1981, the ITA issued a tentative determination to revoke the dumping finding against the foreign producers: Shell, on the basis of its finding that there were no sales at LTFV (with a negligible exception) between January 1, 1976, and February 8, 1979; and Superior, between July 1, 1976, and February 8, 1979. 46 Fed.Reg. 21,214 (1981). The ITA further found that there was no indication of sales at LTFV for either foreign producer since February 8, 1979. *Id.*

Following the tentative determination, Freeport Minerals Company ("Freeport"), a domestic producer of elemental sulfur, requested a full hearing under 19 U.S.C. § 1675(d), and this was conducted in October, 1981. At the hearing, Freeport submitted a Department of Commerce's preliminary review determination of September 15, 1981, which found that most Canadian sulfur producers were selling the commodity in the United States at LTFV during the period ending in November or December, 1980.[2] The ITA refused to require Shell and Superior to submit information updated through the date of its tentative determination to revoke.

In December of 1981, the ITA made a final revocation determination (effective Jan. 27, 1982), from which Freeport sought review in the CIT. 47 Fed.Reg. 3,811 (1982).

## OPINION

Freeport contends, *inter alia*, that the CIT's decision, upholding the ITA determination, was wrong because said determination was not supported by substantial evidence of record, was contrary to statute, and was an abuse of discretion. *Cf.* 19 U.S.C. § 1516a(b)(1) (1982); *Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 932 (Fed.Cir.1984) (standard of review). The Government, Shell, and Superior seek to justify the determination of the ITA and the decision of the CIT by urging that the ITA's determination was within its discretionary authority. Due to our holding that in this case the ITC abused its discretion, we need not address Freeport's other contentions challenging the ITA's interpretations of, and actions under, the applicable statutes and regulations.

The Government and intervenors argue that the statements in the regulations granting discretion to an administering authority are to be read broadly. Indeed, there is precedent for this, although such discretion is not "unbounded." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 166–68, 83 S.Ct. 239, 244–45, 9 L.Ed.2d 207 (1962); *Chevron Standard Ltd. v. United States*, 563 F.Supp. 1381, 1384 (Ct. Int'l Trade 1983). 19 U.S.C. § 1675(c), "Revocation of countervailing duty order or antidumping duty order," provides in pertinent part: "The administering authority may revoke, in whole or in part, a countervailing duty order or an antidumping duty order, or terminate a suspended investigation, after review under this section," and a related regulation, 19 C.F.R. § 353.54, "Revocation of antidumping duty orders and termination of suspended investigations, (a) *In general*," similarly provides

[w]henever the Secretary determines that sales of merchandise subject to an Antidumping Finding or Order or a suspended investigation are no longer being made at less than fair value within the meaning of section 731 of the Act and is

---

**2.** This review covered 47 of the 52 known Canadian producers of elemental sulfur, *Elemental Sulphur From Canada*, 46 Fed.Reg. 45,789 (1981). Notably absent from the report were findings on Shell and Superior.

satisfied that there is no likelihood of resumption of sales at less than fair value, he may act to revoke or terminate, in whole or in part, such Order or Finding.... Ordinarily, consideration of such revocation or termination will be made only subsequent to a review as described in § 353.53 of this part.

■ However, the grant of discretionary authority to an agency implies that the exercise of discretion be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations. Section 353.54, quoted above, must be read in conjunction with the provision to which it refers. The "review" referred to in 19 U.S.C. § 1675(c) and 19 C.F.R. § 353.54 is mandated by 19 U.S.C. § 1675(a), "Periodic review of amount of duty." That review is required to be made at least once during each 12-month period after promulgation of an antidumping order to determine: The amount of net subsidy, the amount of any antidumping duty, and the current status of and compliance with any agreement with the administering authority. 19 U.S.C. § 1675(a)(2) further requires the ITA to determine both the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and the amount by which the foreign market value of each such entry exceeds the United States price of the entry.

As pointed out above, 19 C.F.R. § 353.54(a) requires (1) that the Secretary determine that sales subject to an antidumping order are no longer being made at LTFV and (2) that the Secretary be satisfied that there is no likelihood of resumption of such sales. Thus, not only is a review required "during each 12-month period" under 19 U.S.C. § 1675(a),[3] but the responsibility for making the findings is upon the ITA, which must verify the information it receives under 19 U.S.C. § 1675(a) to support a revocation of an antidumping determination under

19 U.S.C. § 1675(c). S.Rep. No. 249, 96th Cong., 1st Sess. 98, *reprinted in* 1979 *U.S. Code Cong. & Ad.News* 381, 484; *A1 Tech Specialty Steel Corp. v. United States,* 745 F.2d 632, 636 (Fed.Cir.1984).

Moreover, another regulation (19 C.F.R. § 153.44(d)) for the years involved emphasized the importance of current data by mandating that "the Secretary may determine a final modification or revocation is warranted *only if* such company also provides information showing no sales at less than fair value *up to the date of publication of the 'Notice of Tentative Determination to Modify or Revoke Dumping Finding.'*" (Emphasis supplied.) ITA's policy of making findings during the gap period between the last review and the date of the tentative revocation has been described in ITA releases (e.g., *Roller Chain, Other Than Bicycle, From Japan,* 48 Fed. Reg. 51,801, 51,805; *Steel Wire Strand for Prestressed Concrete From Japan,* 48 Fed.Reg. 45,586, 45,587–88 (1983)).

The House Report on the proposed Trade Agreements Act, like the Senate Report, emphasized the importance of using current information with respect to making determinations. "The Committee intends that the Authority and the ITC should *always* use the most up-to-date information available." *A1 Tech Specialty Steel Corp.,* 745 F.2d at 640; H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979). The Government has not provided any reasonable basis for its construction of the statute and regulations to permit otherwise.

■ Congress intended "investigations being commenced unless the authority is convinced that the petition and supporting information ... [do] not provide information supporting the allegations which is reasonably available to [the petitioner]." S.Rep. No. 249, 96th Cong., 1st Sess. 63, *reprinted in* 1979 *U.S.Code Cong. & Ad.*

---

**3.** Congress described the purpose of section 1675: *"Reason for the provision.*—This provision expedites the administration of the assessment phase of antidumping and countervailing duty investigations. It provides a greater role for domestic interested parties and introduces more procedural safeguards." S.Rep. No. 249, 96th Cong., 1st Sess. 80–81, *reprinted in* 1979 *U.S. Code Cong. & Ad.News* 381, 466–67.

*News* 381, 449.[4] Moreover, Congress "intend[ed] the determination as to the information 'reasonably available' to a petitioner to be made in light of the circumstances of each petitioner," because "[i]nformation may be reasonably available to one petitioner but not to another." *Id.* Thus, the legislative history makes clear that, although certain evidence is required from the petitioner for the ITA to revoke an antidumping order, the administering authority must take into consideration the best information available to it, including that supplied by petitioner, and a petitioner's supporting material "reasonably available" to it. *Id.*

In support of the domestic petitioner, Congress intended that the ITA would provide "the maximum availability of information to interested parties" because access to information is imperative for the offensive assertion of its rights. *Id.* at 486. One of the reasons the TAA was promulgated was to remedy the situation recognized by the lawmakers that "[p]etitioners under the antidumping ... laws have long contended that their ability to obtain relief has been impaired by its [sic] lack of access to the information presented by the exporters and foreign manufacturers." *Id.*

In this case, the ITA did not conduct a 19 U.S.C. § 1675(a) review within a year of its tentative revocation determination, and this precluded Freeport's access to current review findings; also, it refused to require Shell and Superior to answer questionnaires on foreign market value and United States pricing data more recently than two years (and for some information, longer) before the final antidumping duty order revocation. Absent access to current data, which were readily obtainable by the ITA,[5] Freeport had no means of acquiring more

"substantial" evidence than it produced at the October 19, 1981, hearing.

Although this court has often deferred to decisions of the administering authority, presumed to be correct, we are persuaded that, in this case, the ITA's refusal to request domestic sales data from Shell and Superior placed upon Freeport an impermissible burden of proof contrary to the policies underlying the applicable statute and regulations.

The Government's arguments suggest that the requirement to make more current findings would impose an unmanageable review-function burden on the ITA. However, Congress clearly considered this point:

> The Committee feels very strongly that both the countervailing and antidumping duty laws have been inadequately enforced in the past, including the lack of resources devoted to this important area of law. The provisions of this bill are intended to remedy this situation.... It is the Committee's understanding that the Executive branch will request appropriations for the purpose of making substantial increases in personnel assigned to the administration of the antidumping and countervailing laws. The Committee cannot emphasize too strongly the need for adequate resources and its expectation that they will be provided.

*Al Tech Specialty Steel Corp.,* 745 F.2d at 641; H.R.Rep. No. 317, 96th Cong., 1st Sess. 49 (1979).

We are not persuaded by the Government's argument that "transitional" cases, involving antidumping determinations that were not terminated by Treasury, are distinguishable from those originally administered by ITA and that the former should receive fewer reviews than the latter. Nor

---

**4.** Although the Government and intervenors attempt to distinguish between the requirements for the *initiation* of an investigation and those for the *perpetuation* of an order, they have offered no reasonable explanation why Congress would have thought the latter a less important or less critical determination warranting less current findings.

**5.** The ITA could easily have sent questionnaires to Shell and Superior at the same time it sent them to the other 47 Canadian producers in 1980. There was no reasonable explanation of why even more current data could not have been requested by the ITA.

are we persuaded that Congress did not recognize, when it transferred administrative functions from Treasury to the ITA, that there would be a large backlog of reviews to be performed. If Congress had intended the ITA to short shrift the "transitional case" of domestic producers and manufacturers by allowing them fewer reviews, or reviews more remote than those for cases administered originally by the ITA, we believe it would have made explicit such a distinction.[6]

In view of the foregoing, we hold that the ITA's failure to obtain recent sales data requested by Freeport constituted an abuse of discretion.

Accordingly, the decision of the CIT is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

**6.** The intervenors' argument in support of the ITA's failure to request additional data that "any additional delay would be inequitable and oppressive" to them is without merit. None of the purposes of the TAA was to prevent foreign producers and manufacturers from experiencing some administrative discomfort.