RHONE POULENC, INC. and Rhone Poulenc Chimie De Base, S.A., Plaintiffs–Appellants,

v.

The UNITED STATES, Defendant–Appellee,

PQ Corporation, Defendant–Appellee.

Nos. 89–1395, 89–1402.

United States Court of Appeals, Federal Circuit.

March 27, 1990.

Rehearing Denied April 20, 1990.

Suggestion for Rehearing In Banc Declined May 2, 1990.

James A. Geraghty, Donohue & Donohue, New York City, argued for plaintiffs-appellants.

M. Martha Ries, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With her on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin. and Pamela A. Green, Atty. Advisor, Office of the Chief Counsel for Import Admin., Dept. of Commerce, Washington, D.C., of counsel. Steven R. Sosnov, Sosnov & Associates, Norristown, Pa., argued for defendant-appellee.

Before RICH, NEWMAN and MICHEL, Circuit Judges.

RICH, Circuit Judge.

These consolidated appeals are from final judgments of the Court of International Trade, dismissing actions brought by importers of anhydrous sodium metasilicate (ASM) from France.[1] The importers challenged the final determinations of the Department of Commerce, International Trade Administration (ITA), in the 1984 and 1985 administrative reviews of the antidumping duty order covering French ASM. We affirm.

## BACKGROUND [2]

Appellants Rhone Poulenc Chimie de Base, S.A. and Rhone Poulenc, Inc. (collectively Rhone Poulenc) are the sole French producer and importer of ASM, a sodium silicate compound used in detergents, waste paper de-inking, and clay processing. In 1981, the ITA found that French ASM was being sold in the United States at a less-than-fair-value (LTFV) sales margin of 60 percent, and the United States International Trade Commission found material injury to the domestic industry by reason of the imports. Accordingly, the ITA issued an antidumping duty order covering French ASM. *Anhydrous Sodium Metasilicate*

---

1. *Rhone Poulenc, Inc. v. United States,* 710 F.Supp. 341 (CIT 1989); *Rhone Poulenc, Inc. v. United States,* 710 F.Supp. 348 (CIT 1989).

2. Additional background on the parties and merchandise may be found in *Rhone Poulenc, S.A. v. United States,* 8 C.I.T. 47, 592 F.Supp. 1318 (1984) and *PQ Corp. v. United States,* 652 F.Supp. 724 (CIT 1987).

*From France; Antidumping Duty Order,* 46 Fed.Reg. 1667 (1981). The order required the United States Customs Service (Customs) to collect cash deposits of estimated antidumping duties in the amount of 60 percent *ad valorem.*

During the first and second administrative reviews of the antidumping order (covering November, 1980 through December, 1981), the ITA determined that there had been no imports of ASM from France. 47 Fed.Reg. 15620 (1982); 47 Fed.Reg. 44594 (1982). During this period, Rhone Poulenc requested a reduction of the 60 percent cash deposit rate determined in the original investigation, claiming that economic conditions had changed. The ITA concluded that it was without power to adjust the margin without an importation during the period of review, and suggested that making an actual importation was the proper way to establish that conditions had changed. *See PQ Corp v. United States,* 652 F.Supp. 724, 727 (CIT 1987).

Accordingly, Rhone Poulenc imported a single shipment of ASM during the following review period (1982). In the administrative review covering 1982 entries, the ITA determined that the sale was *bona fide* and at fair value. It ordered liquidation of the entry without any antidumping duty, and reduced the cash deposit rate to zero percent until publication of the final results of its next administrative review. 49 Fed.Reg. 43733 (1984).[3]

In 1983, as in 1982, Rhone Poulenc made one ASM sale to the United States. In its administrative review covering 1983, the ITA determined that this sale was also at fair value. 53 Fed.Reg. 4195 (1988).[4]

In 1984 and 1985, Rhone Poulenc made numerous imports of ASM into the United States. Pursuant to requests by PQ Corporation, a domestic producer of ASM, the

ITA initiated its fifth and sixth administrative reviews of the antidumping duty order, covering 1984 and 1985 entries respectively. As before, the ITA sent Rhone Poulenc its standard antidumping duty questionnaires, requesting information on Rhone Poulenc's business organization and home market and United States sales.

To make a long story short, the present dispute was precipitated by Rhone Poulenc's responses to the ITA's 1984 and 1985 questionnaires. The ITA found the responses inadequate because they were submitted on paper rather than computer tape, and because sales dates, freight costs, and sales expenses were not stated in sufficient detail. 52 Fed.Reg. 28582 (1987) (1984 review); 52 Fed.Reg. 9320 (1987) (1985 review). In its preliminary results of the 1984 and 1985 administrative reviews, the ITA rejected Rhone Poulenc's questionnaire responses in their entirety, and stated that it was relying upon the "best information otherwise available"[5] to compute Rhone Poulenc's dumping margin, if any. As "best information" of Rhone Poulenc's current margins (1984 and 1985), the ITA stated its intention to revert to the 60 percent margin from the original LTFV investigation, which had been determined on the basis of sales made in 1980. *Id.;* 45 Fed. Reg. 77498 (1980). It then invited comments from interested parties.

Rhone Poulenc vigorously defended its questionnaire responses, insisting that they contained enough data to enable the ITA to ascertain every element necessary for a LTFV calculation, and were no less specific than those the ITA had accepted in the original LTFV investigation and earlier administrative reviews. It asserted that even if the responses were not 100% compliant, the ITA could not totally ignore them and

---

**3.** In *PQ Corp v. United States,* 652 F.Supp. 724, 727 (CIT 1987), a domestic producer of ASM unsuccessfully challenged the ITA's decision.

**4.** The 1983 and 1984 administrative reviews were combined by the agency. For convenience, we refer to them separately.

**5. Determinations to be made on best information available**

In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.
19 U.S.C. § 1677e(c) (1988).

resort to stale margins from the original LTFV investigation. Finally, it contended that the zero percent margins from the more recent administrative reviews were the "best information" of Rhone Poulenc's current margin. 53 Fed.Reg. 4195 (1988) (1984 review); 52 Fed.Reg. 33856 (1987) (1985 review).

The ITA responded as follows:

*Comment 2:* Rhone Poulenc maintains that for any portions of its response which were deficient the Department should use data from the most recently completed administrative review covering 1982, or its submission for the 1983 period. In addition, it contends that under the *Freeport* rule, the Department must use the most recent information available in an antidumping proceeding. Therefore, if the Department determines that the 1985 response is inadequate, for this review it must use information from the 1982 or 1983 responses.

*Department's Position:* The Department is properly using the margin from the [original] fair value investigation for this review as best information available due to our inability to get adequate cooperation from the respondent in submitting information. In conducting our reviews, we are dependent upon the cooperation of the respondent in supplying information for our analysis. Section 776 of the Tariff Act, which authorizes our use of the best information available in certain situations, is intended to encourage cooperation from parties in a proceeding. To use information from the previous two reviews, as respondent suggests, would, in effect, reward the respondent for his failure to provide adequate and timely responses during this review.

Respondent's reliance upon *Freeport Minerals v. United States,* 776 F.2d 1029 (CAFC 1985), is misplaced. That case simply held that the Department must look at up-to-date information in deciding whether to revoke an antidumping duty order. The *Freeport* case is irrelevant to the issue here, which is what data should be used as best information available where a respondent has not provided adequate information. In such cases we are authorized to use information that may be adverse to the interests of a respondent.

52 Fed.Reg. at 33856.[6] The ITA ordered Customs to liquidate Rhone Poulenc's 1984 and 1985 entries with the 60 percent *ad valorem* antidumping duty. *Id.*

### The CIT Decisions

Rhone Poulenc unsuccessfully challenged the ITA's 1984 administrative review in the Court of International Trade (CIT). *Rhone Poulenc, Inc. v. United States,* 710 F.Supp. 341 (CIT 1989) (*Rhone I*). The CIT found that Rhone Poulenc's responses to the questionnaires had been deficient and that the ITA had properly relied upon the "best information" rule. The court rejected Rhone Poulenc's argument that our decision in *Freeport Minerals Co. v. United States,* 776 F.2d 1029 (Fed.Cir.1985) required use of the most recent information, i.e., that from the 1982 and 1983 reviews, and held that, in any event, data from those reviews was unrepresentative because it was based upon so few sales. The court also rejected Rhone Poulenc's argument that the ITA could not automatically resort to the highest prior margin merely to penalize Rhone Poulenc for its deficient responses. *Id.* at 347. Finally, the CIT rejected Rhone Poulenc's argument that the ITA should have updated the 60 percent dumping margin to account for fluctuations in the interest rate and exchange rate of the French franc since 1980. The CIT rejected this argument because Rhone Poulenc had failed to raise it before the ITA. *Id.* at 348.

Rhone Poulenc also challenged the ITA's 1985 administrative review in the Court of International Trade, making basically the same arguments as it did in its challenge to the 1984 review. *Rhone Poulenc, Inc. v. United States,* 710 F.Supp. 348 (CIT 1989)

---

**6.** Quoted here is the ITA's response in the 1985 review. The ITA's response in the 1984 review is similar. *See* 53 Fed.Reg. 4195 (1988).

(*Rhone II*). The CIT reached the same decision as it did in Rhone Poulenc's first action, applying the same reasoning and relying in part upon its prior opinion.

Rhone Poulenc appeals each of these decisions. Because of the interrelationship between the cases, the appeals have been consolidated.

## OPINION

Rhone Poulenc no longer challenges the ITA's total rejection of its questionnaire responses for the 1984 and 1985 reviews. It raises a single issue for our review— whether the CIT erred as a matter of law in upholding the 60 percent margin from the original LTFV investigation as the "best information" of Rhone Poulenc's 1984 and 1985 margins.

### 1. Standard of Review

Administrative determinations under 19 U.S.C. § 1675(a)(1)(B) (1984), such as here, shall be sustained unless they are unsupported by substantial evidence on the record or are otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). *Cf. Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 932 (Fed.Cir. 1984).

Rhone Poulenc asserts three reasons why the ITA's decision is unsupported by substantial evidence or otherwise not in accordance with law. First, it asserts that our decision in *Freeport Minerals v. United States*, 776 F.2d 1029 (Fed.Cir.1985), compelled the ITA to use the most up-to-date sales information—the zero margin data underlying the 1982 and 1983 reviews—as the "best information" of 1984 and 1985 margins. Second, it asserts that the ITA cannot automatically resort to the highest prior margin merely to penalize Rhone Poulenc for its deficient responses. Third, it argues that even if the ITA could rely on the 60 percent margin from the

1980 entries, it was nevertheless required to update the data underlying that margin to account for changes in the interest rate and the exchange rate of the French franc since 1980. We address each of these arguments in turn.[7]

### 2. Freeport Minerals

■ Rhone Poulenc asserts that our decision in *Freeport Minerals v. United States*, 776 F.2d 1029 (Fed.Cir.1985), compelled the ITA to use the most up-to-date sales information—the zero margin data underlying the 1982 and 1983 reviews—as the "best information" of 1984 and 1985 margins.

In *Freeport Minerals*, we held that the data upon which the ITA relied in determining whether to revoke an antidumping order must be current up to the date of publication of the preliminary determination. *Cf. UST, Inc. v. United States*, 831 F.2d 1028 (Fed.Cir.1987). In that context, we stated:

> The House Report on the proposed Trade Agreements Act, like the Senate Report, emphasized the importance of using current information with respect to making determinations. "The Committee intends that the Authority and the ITC should *always* use the most up-to-date information available." *Al Tech Specialty Steel Corp.* [*v. United States*], 745 F.2d [632] at 640 [(Fed.Cir.1984)]; H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979).

776 F.2d at 1032. This passage, Rhone Poulenc points out, parallels House Report comments on the "best information" section of the statute, 19 U.S.C. § 1677e(c). The House Report states:

> [W]henever a party or any other person refuses or is unable to produce information in a timely manner and in the form required, or otherwise significantly impedes an investigation, the Authority [ITA] and the ITC must use the best

---

**7.** In addition, Rhone Poulenc contends that the CIT's alternative ground for affirming the ITA's decision, that the 1982 and 1983 data were "unrepresentative," was a *post hoc* rationalization by agency counsel, not offered by the ITA as a justification for its decision, and therefore can-

not be a basis for sustaining the agency's decision. *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mut.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983). Since we affirm on the other ground stated by the CIT, we do not reach this argument.

information available.... The Committee intends that the Authority and the ITC should always use the most up-to-date information available.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979). From this, Rhone Poulenc concludes "The thrust of the *Freeport Minerals* decision is that, in the words of the House Report, the most up-to-date information available is, by its nature, the best information available."

We disagree. Although we see no escape from our earlier reasoning that Congress desired the ITA always to use the most recent information in administrative reviews, it does not follow, as Rhone Poulenc suggests, that the ITA must *equate* "best information" with "most recent information." What is required is that the ITA obtain and *consider* the most recent information in its determination of what is best information.

We required no more of the ITA in *Freeport*. We remanded in that case for the agency to obtain the most recent information and consider it in its revocation decision. 776 F.2d at 1034. We did not require the agency to consider *only* the most recent information—as Rhone Poulenc would have us do here.

Here the 1982 and 1983 margins were clearly within the pool of information *considered* by the ITA in determining which data were the "best information" of Rhone Poulenc's current margins. Rhone Poulenc's true complaint is that, after considering the 1982 and 1983 margins, the agency found them not to be the "best information" for policy reasons which we discuss below.

### 3. Best Information As A Penalty For Noncompliance

Rhone Poulenc also alleges that the ITA sought out the *most punitive* information, rather than the *best* information. This, it says, is confirmed by the agency's practice of automatically resorting to the highest prior margin when an importer fails to answer its questionnaires.[8] In response to this argument, the agency cites dicta in *Atlantic Sugar Ltd. v. United States,* 744 F.2d 1556 (Fed.Cir.1984), which it is said "explicitly sanctions the use of the best information available as a 'penalty' for non-cooperation."

■ We need not and do not decide the difficult question of whether the agency may use the best information rule to "penalize" a party which submits deficient questionnaire responses. That is not what the agency did in this case. In order for the agency's application of the best information rule to be properly characterized as "punitive," the agency would have had to reject low margin information in favor of high margin information that was demonstrably less probative of current conditions. Here, the agency only *presumed* that the highest prior margin was the best information of current margins. Since Rhone Poulenc offered no evidence showing that recent margins were more probative of current conditions than the highest prior margin, the agency found the highest prior margin to be the best information otherwise available.

■ We believe a permissible interpretation[9] of the best information statute allows the agency to make such a presumption and that the presumption is not "punitive." Rather, it reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less. The agency's approach fairly places the burden of production on the importer, which has in its possession the information capable of rebutting the agen-

---

**8.** "[T]he margin chosen [should] be the highest available, even if that entails use of a margin from a prior period." Government Brief at 24, n. 10.

**9.** Agency interpretations of statutes which they are charged with administering shall be sus-

tained if permissible, unless Congress has directly spoken to the precise question at issue. *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

cy's inference. Moreover, the implementing regulations allow the ITA to take into account an importer's deficient response in determining what is "best information." *See* 19 C.F.R. § 353.51 (1988) ("Where a party ... refuses to provide requested information, that fact may be taken into account in determining what is the best available information.").

The agency's presumption implements the basic purpose of the statute—determining current margins as accurately as possible. In addition, although Congress may not have intended it, the presumption effectively induces importers to comply with agency questionnaires, an important practical consideration since the ITA has no subpoena power. In this latter respect, the rule can be viewed as "an investigative tool, which that agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest." *Atlantic Sugar,* 744 F.2d at 1560. However, since the presumption is rebuttable, it achieves this latter goal without sacrificing the basic purpose of the statute: determining current margins as accurately as possible.

### 4. Adjustment of the 1980 Data

Rhone Poulenc argues that even if the ITA could permissibly rely on the 60 percent margin from the 1980 entries, it was nevertheless required to update the data underlying that margin to account for changes in the interest rate and the exchange rate of the French franc since 1980. The CIT rejected this argument on the ground that Rhone Poulenc never asserted it before the ITA. 710 F.Supp. at 348; 710 F.Supp. at 350.

Rhone Poulenc concedes that it never raised this *argument* before the ITA, but contends it is simply another angle to an *issue* which it did raise before the ITA, whether the 1980 data were the best information. It argues that the Supreme Court's decision in *Hormel v. Helvering,* 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), authorized appellate courts to consider new arguments so long as the general

issue was raised at the agency level. We disagree. In *Hormel,* the court stated that "Ordinarily an appellate court does not give consideration to issues not raised below.... There may be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below." 312 U.S. at 556–57, 61 S.Ct. at 721–22.

This is not such an exceptional case. The CIT found, and Rhone Poulenc does not dispute, that it did not raise the adjustment arguments before the ITA "for tactical reasons." 710 F.Supp. at 348; 710 F.Supp. at 350. Far from it being unjust to Rhone Poulenc, it would have been unjust to the ITA and wasteful of public resources to allow Rhone Poulenc to belatedly raise the argument under these circumstances.

### 5. Other Issues

We have considered the other arguments made by Rhone Poulenc, but find them unpersuasive.

### CONCLUSION

The ITA's finding that the 60 percent margin from the fair value investigation was the "best information" on Rhone Poulenc's 1984 and 1985 dumping margins was supported by substantial evidence on the record and otherwise in accordance with law. Accordingly, the Court of International Trade did not err in upholding the ITA's determinations. The decisions of the Court of International Trade are

AFFIRMED.