# Slip Op. 00-72

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
WORLD FINER FOODS, INC., et al.       )
                                      )
            Plaintiff,                )
                                      )
      v.                              )
                                      )   Consol. Court No.
THE UNITED STATES                     )     99-03-00138
                                      )
            Defendant,                )
                                      )
      and                             )   PUBLIC VERSION
                                      )
BORDEN, INC., NEW WORLD PASTA CO.,    )
AND GOOCH FOODS, INC.,                )
                                      )
            Defendant-Intervenors.    )
_____)
```

[ITA determination remanded.]

Dated: June 26, 2000

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Spencer S. Griffith, Patrick F. J. Macrory and Thomas J. McCarthy) for plaintiff World Finer Foods, Inc.

O'Melveny & Myers L.L.P. (Peggy A. Clarke and Gary N. Horlick) attorneys for plaintiff Barilla Alimentare, S.p.A.

Barnes, Richardson & Colburn (Michael J. Chessler and Matthew T. McGrath) for plaintiff La Molisana Industrie Alimentari, S.p.A.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice (Erin E. Powell), Patrick V. Gallagher, Jr., Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Collier, Shannon, Rill & Scott (Paul Rosenthal and David Smith) for defendant-intervenors Borden, Inc., New World Pasta, Co. and Gooch Foods, Inc.

## Opinion

**RESTANI, Judge:** This matter is before the court on a Motion for Judgment Upon the Agency Record, pursuant to USCIT Rule 56.2, brought by plaintiffs World Finer Foods, Inc. ("Finer Foods"), Barilla Alimentare, S.p.A. ("Barilla") and La Molisana Industrie Alimentari, S.p.A. ("La Molisana").

Under review are the results of the U.S. Department of Commerce's ("Commerce") first administrative review of the antidumping duty order in Certain Pasta from Italy, 64 Fed. Reg. 6615 (Dep't Commerce 1999) (notice of final results and partial rescission of antidumping duty admin. rev.) [hereinafter "Final Results"]. It covers the period from January 19, 1996 through June 30, 1997. Final Results, 64 Fed. Reg. at 6,615.

Finer Foods contests Commerce's application of total adverse facts available under 19 U.S.C. § 1677e (1994). Both Finer Foods and Barilla challenge whether the total adverse facts available rate selected by Commerce is properly corroborated. Finally, La Molisana protests Commerce's refusal to accept corrected clerical information as ministerial correction.

## Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. §

1581(c) (1994).  In reviewing Commerce's determination in antidumping investigations, the court will hold unlawful those agency determinations which are unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1515a(b)(1)(B) (1994).

## I.  Application of Total Adverse Facts Available to Arrighi

### Background

Arrighi S.p.A. Industrie Alimentari ("Arrighi"), an Italian pasta manufacturer, was a supplier of Finer Foods at the time of the original antidumping investigation.  Letter from Finer Foods to Commerce (Mar. 10, 1998), at 1, C.R. Doc. 38, Finer Foods' App., Tab 4, at 1.  Arrighi received a partial facts available margin of 21.34% in the original antidumping investigation, which effectively precluded it from exporting to the United States.  Letter from Finer Foods to Commerce (Oct. 20, 1997), at 7, P.R. Doc. 67, Finer Foods' App., Tab 3, at 7.  Arrighi stopped exporting pasta to the United States in May, 1997.[1]  Commerce's Memorandum to File (Aug. 8, 1997), at 1, P.R. Doc. 10, Finer Foods' App., Tab 1, at 1.  Arrighi advised Commerce that it had ceased exporting

---

[1]  Finer Foods continued to import pasta from Arrighi while it wound down its purchases of Arrighi pasta after the high cash deposit rate was imposed.  It is the duties due on the last entries from Arrighi that give rise to this action.

to the United States and the brand name pasta it previously exported to the United States was now being produced and exported by another Italian company. Id.

Nevertheless, Commerce sent Arrighi a questionnaire and requested that Arrighi respond and cooperate with regard to the administrative review. Letter from Commerce to Arrighi (Sept. 4, 1997), at 1, P.R. Doc. 18, Finer Foods' App., Tab 2, at 1. Commerce stated that it would "attempt to accommodate any difficulties that [Arrighi] encounter[ed] in answering this questionnaire," and asked Arrighi to contact the official in charge if there were any questions. Id. at 2, Finer Foods' App., Tab 2, at 2.

Arrighi responded to Commerce and explained in further detail that its financial situation had deteriorated dramatically due to the antidumping duty rate that Commerce imposed in the original investigation and that Arrighi had to devote its limited resources to developing alternative markets outside of the United States. Letter from Finer Foods to Commerce (Oct. 20, 1997), at 6-9, Finer Foods' App., Tab 3, at 6-9. Arrighi could not spare the personnel required to answer Commerce's questionnaire even though Finer Foods had offered to pay all the legal and experts' fees for Arrighi to respond to the questionnaire. Id. at 8, Finer Foods' App., Tab 3, at

8. Arrighi did offer to "supply limited information if the Department felt that might be worthwhile or helpful" in its review. Id. at 9, Finer Foods' App., Tab 3, at 9. Commerce never responded to this letter.

Finer Foods submitted to Commerce all the information in its possession regarding purchases from Arrighi. Letter from Finer Foods to Commerce (Mar. 10, 1998), at 1-7, Finer Foods' App., Tab 4, at 1-7. Commerce also did not respond to this letter.

Commerce determined in the Final Results that Arrighi failed to cooperate by not responding to the antidumping questionnaire and did not act to the best of its ability to comply with Commerce's request for information. Final Results, 64 Fed. Reg. at 6616. Commerce assigned an adverse facts available margin of 71.49%, the highest margin from the petition. Id. Finer Foods challenges the use of adverse facts available against Arrighi.

## Discussion

Finer Foods objects to the use of adverse facts available where it has made every effort to cooperate; it has urged Arrighi to cooperate; Arrighi offered limited cooperation and Commerce never responded to these offers of cooperation. The court agrees.

Commerce correctly notes that it may resort to facts available if Arrighi failed "to provide [the requested] information by the deadlines for submission . . . or in the form and manner requested." 19 U.S.C. § 1677e(a)(2)(B). Before Commerce can resort to adverse facts available, however, Commerce is required to comply with 19 U.S.C. § 1677m. Id. Commerce did not properly comply with the requirements of subsections (c) and (e) of § 1677m.

In Borden, Inc. v. United States, this court made clear that the new statutory scheme, 19 U.S.C. § 1677m, is designed to prevent the unrestrained use of facts available as to a firm that makes its best efforts to cooperate with Commerce. 4 F. Supp.2d 1221, 1245 (Ct. Int'l Trade 1998), aff'd sub nom. F. LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, No. 99-1318, 2000 U.S. App. Lexis 14148 (Fed Cir. June 16, 2000). This section was enacted as a part of the Uruguay Rounds Agreement Act ("URAA"), Pub. L. 103-465, § 231, to implement portions of Annex II to the Antidumping Agreement, which provides, in part, that information which "may not be ideal" should not be disregarded if the party "has acted to the best of its ability." Annex II of the Agreement on Implementation of Article VI of GATT at ¶ 5, reprinted in, U.S. Trade Representative, Final Texts of the GATT Uruguay

Round Agreements 168 (1994) [hereinafter "Annex II"].

The key provisions of 19 U.S.C. § 1677m for purposes of this case are subsection (c), regarding "difficulties in meeting requirements," and subsection (e) regarding the "use of certain information."  Subsection (c) requires a party to promptly notify Commerce as to why it cannot comply with the requirements of the questionnaire.  19 U.S.C. § 1677m(c)(1) (1994).[2]  Arrighi did that.  Section 1677m(c)(1) also requires Arrighi to offer an alternative form in which it could submit the information.  Id.  Arrighi did not describe exactly what form of information it could provide; but it did offer to supply any "limited information that Commerce felt might be

---

[2]     19 U.S.C. § 1677m(c) provides in relevant part:
(c) Difficulties in meeting requirements
   (1) Notification by interested party
       If an interested party, promptly . . . notifies the administering authority . . . that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority . . . shall consider the ability of the interested party to submit the information . . . and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.
       (2) Assistance to interested parties
       The administering authority . . . shall take into account any difficulties experienced by interested parties, particularly small companies, in supplying information requested by the administering authority or the Commission in connection with investigations and reviews under this subtitle, and shall provide to such interested parties any assistance that is practicable in supplying such information. 19 U.S.C. § 1677m(c) (emphasis added).

worthwhile or helpful." Letter from Finer Foods to Commerce
(Oct. 20, 1997), at 9, Finer Foods' App., Tab 3, at 9. At
that point, Commerce should have offered Arrighi some
guidance. It did not do so.

Because Arrighi offered to submit what it could, the
burden shifted to Commerce to consider Arrighi's ability to
respond with some specificity and to modify its requirements,
if necessary. 19 U.S.C. § 1677m(c)(2). Instead, Commerce
focused on Arrighi's failure to provide a specific counter-
proposal and questioned the veracity of Arrighi's certified
statement that it did not have the financial resources or
personnel to provide the information Commerce required. Final
Results, 64 Fed. Reg. at 6616. Commerce discounted Arrighi's
explanation that it had lost 30-40% of its total sales after
Commerce imposed a 21.34% dumping margin in the original
antidumping investigation; that it had laid off a significant
number of employees; and that it no longer had the personnel
or resources to compile the information Commerce sought even
if Finer Foods were to pay for the legal and expert fees.
Letter from Finer Foods to Commerce (Oct. 20, 1997), at 7-8,
Finer Foods' App., Tab 3, at 7-8. Commerce called this
"merely . . . a business decision not to allocate resources to
this task." Final Results, 64 Fed. Reg. at 6616.

Finer Foods' points out that Arrighi's situation is comparable to Flores Estrella's situation in <u>Certain Fresh Cut Flower from Colombia</u>, 59 Fed. Reg. 15,159, 15,174 (Dep't Commerce 1994) (final results).  At the time Flores Estrella received Commerce's questionnaire, the company had laid off 40 workers and was facing the possibility of liquidation.  <u>Id.</u> at 15,173-74.  Commerce was not able to "conclude that Flores Estrella was incapable of responding to the questionnaire. Nonetheless, [Commerce] recognize[d] that the company was subject to financial and personnel constraints at that time." <u>Id.</u> at 15,174.  Additionally, Flores Estrella, like Arrighi, made a similar offer to provide partial information.  <u>Id.</u> Commerce never responded to Flores Estrella's offer to cooperate.  <u>Id.</u>  Commerce decided not to apply the first tier BIA rate to Flores Estrella based on Flores Estrella's offer to cooperate and Commerce's own failure to follow up on this offer.  <u>Id.</u>

Commerce's complete disregard of the information provided by Arrighi, as well as its failure to respond in any way to Arrighi's offer of limited assistance similarly precludes Commerce from imposing punitive adverse facts available. Although Arrighi had not yet suggested a specific alternative form to submit the information as required by 19 U.S.C. §

1677m(c)(1), this was not a situation where the information was readily available in some other form.  Commerce has an obligation to assist interested parties experiencing difficulties and "<u>shall</u> provide to such interested parties any assistance that is practicable in supplying such information." 19 U.S.C. § 1677m(c)(2) (emphasis added).  Commerce did not suggest any way to avoid a totally adverse margin and provided no assistance to Arrighi even though Arrighi offered to cooperate in providing a simpler form of the information required.  <u>See also</u> <u>Allied Signal Aerospace Co. v. United States</u>, 996 F.2d 1185, 1192 (Fed. Cir. 1993)(holding impermissible application of first-tier BIA (adverse inference) to company that offered to cooperate but Commerce never responded to offer of cooperation).

Commerce has not followed the appropriate steps to reach an adverse inference from the facts available.[3]  Commerce

---

[3]  The court has repeatedly brought to Commerce's attention the new statutory scheme restricting the application of an adverse inference pursuant to 19 U.S.C. § 1677e(c).  <u>See</u> <u>F. LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States</u>, No. 99-1318, 2000 U.S. App. Lexis 14148, *13 (Fed. Cir. June 16, 2000) ("Commerce's discretion in these matters . . . is not unbounded.") [hereinafter "<u>De Cecco</u>"].   Commerce is required to make subtler judgments supported by substantial evidence in the agency record and must pay attention to the burden allocation in §1677m(c).  <u>See e.g.</u>, <u>Ferro Union, Inc. v. United States</u>, 44 F. Supp.2d 1310, 1329 (Ct. Int'l Trade 1999).

might have gotten some information from Arrighi if it had
responded to Arrighi's offer of cooperation.  Only at that
point could it decide if the offer was genuine, if the
information was sufficient, and whether best efforts had been
made or not.  Commerce's response to Arrighi was crucial in
this case.  Arrighi, which had left the market, did not have
the normal incentives to cooperate, leaving the importer,
Finer Foods, in a difficult position, as it alone would bear
the full impact of increased duties.[4]  In such a situation, it
is imperative that Commerce respond to overtures of
cooperation from the exporter/producer.[5]

---

[4]  As the producer, Arrighi normally would try and obtain
the lowest dumping margin possible in an effort to be able to
sell at a competitive price.  In this case, though, Arrighi
had  received a dumping margin in the prior administrative
review that was so high that it precluded further exports to
the U.S. market.  See Certain Pasta from Italy, 61 Fed. Reg.
38,547, 38,548 (Dep't Commerce 1996) (setting Arrighi's final
weighted average dumping margin at 21.34%); and Letter from
Finer Foods to Commerce (Oct. 20, 1997), at 6-9, Finer Foods'
App., Tab 3, at 6-9.  Thus, Arrighi no longer had the usual
"incentive" to cooperate with either Finer Foods or Commerce.
As the importer of record, Finer Foods would be responsible
for paying the dumping duty and bear the onus of any perceived
failure of Arrighi to cooperate.  See 19 C.F.R. § 141.1(b)
(1998) ("[L]iability for duties . . . constitutes personal
debt due from importer to the United States."); see also 19
C.F.R. § 351.402(f) (2000).

[5]  Even where Commerce may use adverse facts available,
obtaining as much information as possible might provide a
better basis for corroborating a substitute margin.
Nonetheless, the court does not hold that every general

(continued...)

The court also disagrees with Commerce's refusal to consider the information submitted by Finer Foods. The information meets all of the criteria set forth in 19 U.S.C. § 1677m(e) for the use of information.[6] Commerce did not reject Finer Foods' submissions based on any of the five statutory criteria but stated generally that "it was insufficient for purposes of calculating a dumping margin for Arrighi in accordance with the statute." Final Results, 64 Fed. Reg. at 6620. Commerce is required to consider the information submitted even though it "does not meet all the applicable

_____

[5](...continued)
overture of cooperation warrants a response from Commerce. The court's ruling is based on the particular situation affecting Arrighi and its importers.

[6] Section 1677m(e) provides in relevant part:
        In reaching a determination . . . the administering authority . . . shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority . . . if –
        (1) the information is submitted by the deadline established for submission,
        (2) the information can be verified,
        (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
        (4) the interested party has demonstrated that it has acted to the best of its ability in providing the information and meeting the requirements established by the administering authority . . . with respect to the information, and
        (5) the information can be used without undue difficulties.
19 U.S.C. § 1677m(e) (emphasis added).

requirements established by the administrative authority."  19

U.S.C. § 1677m(e).  Thus, even though Commerce could not use

the information to determine the normal value, the information

that Finer Foods provided indicated that Arrighi likely would

not have received a high margin, and certainly not a margin as

high as the one selected by Commerce.  See Letter from Finer

Foods to Commerce (Mar. 10, 1998), at 1-3,  Finer Foods' App.,

Tab 4, at 1-3.  Commerce has not indicated that this

information, though limited, is unreliable for the narrow

purpose for which it was submitted.[7]  Commerce shall

reconsider the information provided by Finer Foods and

determine an appropriate facts available rate for Arrighi.[8]

## II. Corroboration of Adverse Facts Available Rate

### Background

Finer Foods and Barilla[9] contest Commerce's adoption of

the highest margin from the petition as the adverse facts

available rate.  They claim its selection violates 19 U.S.C. §

---

[7]  []

[8]  The court understands that at this point a substitute margin likely will be required, but it may not be the entirely adverse margin selected by Commerce.

[9]  Barilla never responded to Commerce's questionnaire. Final Results, 64 Fed. Reg. at 6616.  Barilla does not challenge Commerce's use of adverse facts available, instead it limits its challenge to the corroboration of the adverse facts available rate.

1677e(c).[10]

To corroborate the petition margin, Commerce used
individual transaction margins from the original less than
fair value ("LTFV") investigation. Commerce's Memorandum to
File (Feb. 3, 1999), at 2, C.R. Doc. 120, Finer Foods' App.,
Tab 6, at 2. Because a few of these specific transaction
margins exceeded 71.49% (the highest petition margin),
Commerce determined that the highest petition rate was
corroborated. Id. at 2-3, Finer Foods' App., Tab 6, at 2-3.
Commerce next compared the petition rate with specific
transaction margins calculated for fully cooperative
respondents in this administrative review and found that the
petition rate fell within the range of individual transaction
margins calculated. Final Results, 64 Fed. Reg. at 6,621.
Commerce concluded that the petition rates represented a
reasonable estimate of the level of dumping that occurred
during the period of review. Commerce's Memorandum to File
(Feb. 3, 1999), at 3, Finer Foods' App., Tab 6, at 3.
Commerce claims that the use of petitioners' margin is

_____

[10] 19 U.S.C. § 1677e(c) provides:
When the administering authority or the Commission relies on
secondary information rather than on information obtained in
the course of an investigation or review, the administering
authority or the Commission, as the case may be, shall, to the
extent practicable, corroborate that information from
independent sources that are reasonably at their disposal.

corroborated by the individual transaction margins from the LTFV investigation.  Barilla and Finer Foods challenge this finding.

The court's determination in the preceding section prevents application of the petition margin to Arrighi.  The issue is outstanding as to Barilla.

## Discussion

Pursuant to 19 U.S.C. § 1677e(c), Commerce must corroborate secondary information it relies on "to the extent practicable" from independent sources reasonably at its disposal.  Both the Antidumping Agreement of GATT 1994 and the URAA indicate that secondary information is to be corroborated.  The Antidumping Agreement requires Contracting Parties use secondary sources with "special circumspection" and to check secondary information from other "independent sources," including published price lists, official import statistics, customs returns or information from other interested parties.  Annex II at ¶ 7, reprinted in U.S. Trade Representative, Final Texts of the GATT Uruguay Round Agreements 168-69 (1994).  The Statement of Administrative Action ("SAA") further clarifies that "secondary information may not be entirely reliable" and that "[c]orroborate means that the agencies will satisfy themselves that the secondary

information to be used has probative value." SAA accompanying the URAA, H.R. Rep. No. 103-826(I) at 870, reprinted in 1994 U.S.S.C.A.N. at 4199. The SAA specifically singles out the information contained in the petition as an example of unreliable information because it is based upon unverified allegations. Id.

In keeping with these guidelines, the court instructed Commerce in Ferro Union that: 1) Commerce cannot apply a margin that has been discredited; and 2) Commerce must select a margin which bears a rational relationship to the matter to which it is to be applied. 44 F. Supp.2d at 1334-35 (citations omitted). Barilla correctly notes that the petitioners' margins were not corroborated and had been previously discredited in this court's review of the original antidumping duty order. De Cecco, No. 99-1318, 2000 U.S. App. Lexis 14148 at *15. The petitioners' margin, considered inherently suspect by the SAA, is further suspect in this review because the calculated rates for all parties participating in this review have fallen even further. Compare Certain Pasta from Italy, 61 Fed. Reg. at 38,548 (final LTFV investigation margins ranged from 0.67% to 21.34%), with Final Results, 64 Fed. Reg. at 6,630-31 (final admin. rev. margins ranged from 0.32% to 12.26%). A bare

possibility does exist that Barilla's overall margin may be in the very high range selected by Commerce because that possibility cannot be eliminated without verifying its own data.  The improbability that the hypothesis is true, however, is demonstrated by the low margins of all respondents, and the trend of those margins.

In corroborating the petitioners' margin, Commerce is under an obligation to use data that bears a rational relationship to the matter to which it is applied.  De Cecco, No. 99-1318, 2000 U.S. App. Lexis 14148 at *19 ("By requiring corroboration of adverse inference rates, Congress clearly intended that such rates should be reasonable and have some basis in reality."); see also Ferro Union, 44 F. Supp.2d at 1334.  Here, Commerce used individual transactions from other respondents without explaining: (1) whether these transactions represented a significant portion of the transactions at issue; and (2) how these transactions related to a rational dumping duty margin for Barilla.  Commerce nevertheless concluded from these random, apparently aberrant transactions of other respondents that exceeded 71.49%[11] that the margin

---

[11]  To corroborate the petition rate, Commerce examined the transaction margins from five respondents that fully cooperated in the original LTFV investigation.  Commerce's Memorandum to File (Feb. 3, 1999), at 2, Finer Foods' App.,
(continued...)

alleged in the petition is corroborated.  Final Results, 64

Fed. Reg. at 6,620-21.  The original LTFV investigation in

this matter involved an extremely large sales database from a

number of respondents.  It is highly unlikely that the

petition margin, which was so far from the calculated margins

of both the original investigation and this administrative

review, had any validity at all.  Without evidence to support

Commerce's use of the individual transaction margins as

corroboration, the court cannot uphold the use of these

apparently aberrant transactions as corroboration for

petitioners' margin.  Therefore, Commerce shall reconsider the

---

[11](...continued)
Tab 6, at 2.  From those transactions, Commerce focused on the
25 highest calculated transaction margins of only [] of the
five respondents to justify the use of the petitioners'
margin.  Id.  []  Id. at 3, Finer Foods' App., Tab 6, at 3.
Commerce used these transactions to determine that "the
petition rates represent a reasonable estimate of a level of
dumping that occurred during the POI."  Id.  The original LTFV
investigation, though, covered well over a million individual
observations.  See e.g., Letter from De Cecco to Commerce
(Feb. 15, 1996), at 4, P.R. Doc. 689, De Cecco's App. in Ct.
No. 96-08-01970, Tab 31, at 4 (reporting over 900,000
observations to Commerce); Delverde's Section B and C
Response, App. B-2 (Sept. 14, 1995) (reporting 283,977
observations to Commerce), at 37, P.R. Doc. 275, De Cecco's
App. in Ct. No. 96-08-01970, Tab 38A, at 1; La Molisana's
Section B Response, App. B-1 (Sept. 13, 1995), C.R. Doc. 63,
De Cecco's App. in Ct. No. 96-08-01970, Tab 57, at 1
(reporting [] observations to Commerce).  Commerce's use of a
few arbitrarily selected transactions, where such an extensive
database of information exists to test the petition margin,
does not constitute sufficient corroboration.

adverse facts available margin with respect to Barilla.

Commerce shall determine a margin that, although adverse,

bears some rational relationship to the current level of

dumping in the industry and shall provide proper corroboration

explaining the probative value of the data used in determining

the adverse facts available margin.

## III.  Distinguishing New Information From Clerical Or Ministerial  Error Correction

### Background

La Molisana's original submission to Commerce correctly

indicated in the narrative that it was the importer of record

on <u>most</u> sales.  <u>Questionnaire Response to Sections A-D</u> (Nov.

10, 1997), at C-43, C.R. Doc. 11, La Molisana's App., Tab A-1,

at 2.   The computer tape, though, originally recorded Company

A,[12] as the importer of record for all sales in the U.S.

market.  <u>Corrections to La Molisana's Questionnaire Response</u>

(Dec. 15, 1997), at 3, C.R. Doc. 20, La Molisana's App., Tab

A-2, at 3.  La Molisana submitted a new U.S. market sales tape

indicating that La Molisana was the importer of record for all

U.S. market sales.  <u>Id.</u> at 2, La Molisana's App., Tab A-2, at

2.

---

[12]   Company A is [].  <u>Corrections to La Molisana's Questionnaire Response</u> (Dec. 15, 1997), at 3, C.R. Doc. 20, La Molisana's App., Tab A-2, at 3.

On March 23, 1998, La Molisana again attempted to correct the confusion surrounding the importer of record. La Molisana's Supplemental Questionnaire Response (Mar. 23, 1998), at C-11, C.R. Doc. 45, La Molisana's App., Tab A-3, at 2. La Molisana's narrative correctly explained that La Molisana was the importer of record for certain entries but Company A was the importer of record for all entries designated "FOB, Port of Naples". Id. The U.S. market sales tape, though, remained uncorrected and designated La Molisana as importer of record for all U.S. sales.

La Molisana did not realize this inconsistency existed until after the Preliminary Result was published on August 7, 1998.[13] La Molisana explained that the correction would not affect Commerce's margin calculation.[14] Letter from La Molisana to Commerce (Oct. 27, 1998), at 2, La Molisana's App., Tab. B-1, at 2.

Commerce rejected La Molisana's October 27th letter as an untimely submission of new factual information. Letter from Commerce to La Molisana (Dec. 2, 1998), at 1-2, La Molisana's App., Tab B-2, at 1-2. Pursuant to 19 C.F.R. §351.301(b)(2)

---

[13]   [ ]

[14]   [ ]

(1998),[15] the deadline for submitting new factual information

was January 15, 1998 and Commerce argues that La Molisana's

submission was more than 10 months late.  Id.  Commerce also

rejected La Molisana's argument that the corrections should be

accepted as clerical error because they were untimely and

unreliable.[16]  Commerce published the Final Results without

correcting the alleged error. See Final Results, 64 Fed. Reg.

at 6,615.

La Molisana next submitted a timely request for

_____

[15]  Section 351.301(b)(2) provides, in pertinent part that
a submission of factual information is due no later than 140
days after the last day of the anniversary month.

[16]  Commerce accepts clerical corrections if all the
following conditions are satisfied:
(1) the error in question must be demonstrated to be a
clerical error, and not a methodological error, an error in
judgment, or a substantive error;
(2) Commerce must be satisfied that the corrective
documentation provided in support of the clerical error
allegation is reliable;
(3) the respondent must have availed itself of the earliest
reasonable opportunity to correct the error;
(4) the clerical error allegation, and any corrective
documentation, must be submitted to Commerce no later than the
due date for the respondent's administrative case brief;
(5) the clerical error must not entail a substantial revision
of the responses;
(6) the respondent's corrective documentation must not
contradict information previously determined to be accurate at
verification.
Certain Fresh Cut Flowers from Colombia, 61 Fed. Reg. 42,833,
42,834 (Dep't Commerce 1996).  The Department determined that
elements (2) and (4) are not satisfied. Letter from Commerce
to La Molisana (Dec. 2, 1998), at 1-2, La Molisana's App., Tab
B-2, at 1-2.

correction of ministerial error after the final results are published.  Letter from La Molisana to Commerce (Feb. 17, 1999), at 1, C.R. Doc. 122, La Molisana's App., Tab A-6, at 1. Commerce again rejected this request, stating that the requested correction consisted of new information.  Memorandum from Commerce to Richard Moreland (Mar. 11, 1999), at 2, C.R. Doc. 125, La Molisana's App., Tab A-7, at 2.  La Molisana now appeals to this court for relief.

## Discussion

Factual information includes "information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, allegations concerning market viability . . . and upstream subsidy allegations."  19 C.F.R. § 351.301(a)(1999).  Ministerial error, on the other hand, is "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like and any other similar type of unintentional error which the Secretary considers ministerial." 19 C.F.R. § 351.224(f) (1999) (emphasis added).

In this case, the U.S. market sales tape in the original questionnaire response contained errors due to an inaccurate supply of information.  Commerce characterizes La Molisana's

corrections as new factual information.  La Molisana, in contrast, characterizes the information as clerical errors due to inaccurate copying.  La Molisana argues that Commerce has abused its discretion by refusing to allow this clerical or ministerial error correction.  The court agrees.

Where the line is difficult to draw between permissible ministerial or clerical error correction and impermissible factual or methodological changes, based upon Commerce's past practice, it should have classified the error here as clerical or ministerial error.  First, Commerce acknowledged the "general inconsistency with respect to the database field in question."  Letter from Commerce to La Molisana (Dec. 2, 1998), at 2, La Molisana's App., Tab B-2, at 2.  Therefore, when La Molisana offered to correct its incorrect computer tape to match the narrative that had been submitted to address this inconsistency, it simply sought to rectify an error that is apparent from the agency record.

Second, Commerce's refusal to accept the information because it is "unreliable" is unjustified.  Ordinarily there is no verification of submissions in an administrative review.  Therefore, there is no reason for Commerce to infer greater reliability in the information initially submitted as opposed to the information submitted for corrective purposes.

Further, in this case the error was fully explained and La Molisana offered corroboration that Company A was an importer during the POR, though Company A was not specifically listed as one of La Molisana's importers. F. LLI De Cecco Di Filippo Fara San Martino S.P.A. v. United States, No. 96-08-01930, Ex. A (Ct. Int'l Trade Oct. 23, 1997) (listing Company A as one of the importers during the improper provisional period). Moreover, Commerce has offered no evidence that indicates that the information received was unreliable. Thus, Commerce has not substantiated its finding that La Molisana's corrected information failed to meet the second criteria in its six-part clerical error test, that the corrected information was reliable.

La Molisana correctly notes that the facts of this case are parallel to NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed. Cir. 1995). In NTN, the plaintiff mistakenly included in its U.S. sales database four sales which were actually sales to a Canadian customer for goods that never entered the United States. See NTN, 74 F.3d at 1208. Commerce did not dispute that this error was clerical. Similarly, in this case, La Molisana erroneously stated that it was the importer of record for pasta it did not import. La Molisana, like the NTN plaintiff, was fully cooperative in the course of

the review and submitted the necessary and correct information requested by Commerce, except that it failed to incorporate a portion of this information in its tape. "[D]raconian penalties are [in]appropriate for the making of clerical errors" because they are mere inadvertencies, and "[w]hile the parties must exercise care in their submissions, it is unreasonable to require perfection." Id. at 1208. Commerce's refusal to adopt the correction violates the notion that dumping margins are to be determined "as accurately as possible." Id. (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, at 1191 (Fed. Cir. 1990)) (quotations omitted).

Moreover, as La Molisana has argued, making the correction imposes little burden on Commerce. Commerce only had to correct the specified lines in the assessment rate[17] calculation program  and then rerun it. Letter from La Molisana to Commerce (Oct. 27, 1998), at 4-5, La Molisana's App., B-1, at 4-5. La Molisana has set forth the exact

---

[17]  La Molisana is asking Commerce to comply with the methodology set forth in 19 C.F.R. § 351.212(b) (1999). Commerce "normally will calculate an assessment rate for each importer of subject merchandise covered by the review. [Commerce] normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes. [Commerce] will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise." 19 C.F.R. § 351.212(b).

corrections to the computer program in its October 27, 1997 letter to Commerce.  Id.  It would "neither have required beginning anew nor have delayed making the final determinations." NTN, 74 F.3d at 1208.  Use of the mistakenly submitted information would be punitive to La Molisana.  Here, a simple adjustment in the assessment program is all that was required to serve the dumping duty's "remedial" rather than "punitive" purpose.  See id. (citation omitted).

The court recognizes the tension between finality and correct result.  See NTN, 74 F.3d at 1208.  La Molisana, though, has been trying to make this same correction from the time of the publication of the preliminary results.  At the time La Molisana requested the correction, the tension between finality and correctness simply did not exist.  See id. at 1208 (citation omitted).  Further, as this matter is remanded for other reasons, there appears to be no administrative efficiency reason to perpetuate the error.

Commerce must re-calculate the assessment rate for La Molisana.

## Conclusion

For the foregoing reasons, the court remands this matter to Commerce to: 1) determine an appropriate facts available rate for Arrighi; 2) reconsider the adverse facts available

margin with respect to Barilla and assess a dumping margin that, while adverse, bears a rational relationship to the probability of dumping; and 3) re-calculate the assessment rate for La Molisana.[18]

Remand results are due within 45 days.  Objections are due 20 days thereafter, responses 11 days thereafter.


_____
Jane A. Restani
JUDGE


Dated:  New York, New York

This 26th day of June, 2000.

_____

[18]  Specifically, [].